## McAlanis License

*Charles E. Duncan, Jr.*, for petitioner.
*Robert V. Moser*, for remonstrant.

FORTNEY, P. J., July 9, 1951.—Petitioner has made application for a detective's license under the provisions of the Act of May 23, 1887, P. L. 173, 22 PS §2. He was, at the time of the hearing, the holder of such license. A remonstrance has been filed against the granting of a new license, wherein it is alleged that applicant has been guilty of conduct unbecoming a person charged with his duties, and in addition, no necessity exists for the license.

A brief résumé of the facts gathered from the testimony taken at the hearing on this petition, and from the written stipulation of counsel, is necessary for a thorough understanding of the contentions of the parties.

Charles W. Shoffstall, remonstrant, is the owner of certain premises, with the buildings thereon erected, situate near the Village of Natalie, this county, on Highway Route 54. During the years 1948 and 1949 the Natalie Pistol and Rifle Club occupied a portion of one of these buildings as club headquarters, and the remaining portion of the same building was occupied by Shofftstall, who was steward of the club, and his family, as living quarters. In another building situate on these premises Shoffstall conducted a public auction at regular intervals. Unhappy differences between the members, and financial reverses, caused the Natalie Pistol and Rifle Club to cease operation.

Petitioner herein, who is also a constable in the City of Shamokin, was authorized, in writing, in his capacity as constable to remove from the premises cer-

tain ammunition stored in the club rooms. The attempt to carry into effect these instructions is the basis of remonstrant's first complaint.

It is contended that petitioner and two others, about the middle of September 1949, came to the building, which housed the club and, while Shoffstall and his family were eating their evening meal, petitioner pushed open the back door and, accompanied by one of the other men, entered the building, at the same time remarking: "I am going to clean this place out." It is alleged that petitioner carried a blackjack in his hand and his companion carried a gun. The refusal to surrender the ammunition resulted in a verbal altercation between remonstrant, his son, and petitioner. Remonstrant picked up a gun and it was then decided that before trouble ensued legal counsel should be obtained. As a result of the advice thus obtained, petitioner and his companion prepared to leave the premises, but it is contended when he was about to leave petitioner said, holding a blackjack in his hand: "I am going to get you two fellows no matter how I get you"; and at the same time remarked to the wife of remonstrant: "When they get tough with me I use the blackjack on them and soften them up." In this testimony Shoffstall is corroborated in substance by his son.

Petitioner and his witnesses tell an entirely different story. It is admitted by them that on October 7, 1949, in pursuance to their written authority, they went to the Shoffstall premises about 4 p.m. to remove certain ammunition. Petitioner and one man entered the building, the other man remained outside. Petitioner testifies that after he exhibited his authority, Shoffstall went into a rage, and he and his son each picked up a gun, saying: "Come and try to get them." Petitioner, realizing trouble was brewing, tried to calm things down, and suggested the matter be handled in the

proper way by calling counsel. He sat down at the counter, drank coffee, talked things over, while his companion was otherwise engaged in amusing himself, and then left the premises. He says he didn't threaten Shoffstall, had no blackjack, and his companion had no gun. In general this testimony of petitioner is corroborated by his companion, who was his brother, and this is particularly true as to the threats made and the carrying of a blackjack and a gun.

The burden of proving the unbecoming conduct of petitioner is on remonstrant. We are convinced, after a study of the record, that this burden has not been met. The inability of remonstrant and his witnesses to state the correct date of the occurrence, their evasive, confused and contradictory testimony in relation to the gun carried by petitioner's companion, the failure to take legal action, the attempt to use this occurrence as a protest to the issuance of a license two years later, minimizes its severity and furnishes the facts and circumstances upon which we base this conclusion.

The other occurrence which it is alleged disqualifies petitioner from being granted a detective license happened about October 12, 1949. One Mitchell Rappaport, the same person who authorized the removal of the ammunition from the club, together with several associates, completed the erection and construction of an outdoor theatre on May 6, 1949. This theatre adjoined that portion of the premises of remonstrant on which he conducted his public auction. Petitioner was employed at the theatre to direct traffic and prevent people desiring to attend the auction from parking their cars along the berm of the highway so that the entrance to the theatre would be blocked. On this occasion an altercation arose between the son of remonstrant, petitioner, and one of his employes. It is alleged as a result of insulting remarks and loud and

boisterous noises made by the son of remonstrant in his attempt to prevent petitioner from keeping the entrance to the theatre open, the son was advised he would be arrested for disorderly conduct. In an attempt to apprehend the son, who ran to his father, who stood near by, to evade petitioner, an altercation again occurred between petitioner and remonstrant. A thorough study of the testimony of this occurrence convinces us that petitioner, on this occasion, only performed his duty and is not guilty of any unbecoming conduct.

As to the necessity of the issuance of the license, it is stipulated by counsel that petitioner had, at the time of this hearing, duly executed written contracts with 13 clients to serve them in the capacity of a detective and in the protection of their property. These clients include a bank, a garage, several business places, as well as independent mining operations. In view of the fact that this is, in effect, a renewal of an existing license, the claim of remonstrant in this respect fails.

The act under which this application is made provides that no such license shall be granted until satisfactory proof of the competency and integrity of such person or persons shall have been made to the court. In Cameron's License, 25 Dist. R. 917, 919, it is said, the definition of "competency and integrity" is defined to include 'a person experienced in the essentials of the business he proposes to engage in, acquainted with the methods and habits of criminals, familiar with the privileges and duties of officers charged with their pursuit and arrest, possessed of the requisite courage, moderation, coolness and integrity to act judiciously and efficiently in trying situations'."

Petitioner herein has been a constable for more than 10 years. From the court's own knowledge, he is experienced in the essentials of the business in which he proposes to engage. We believe in his conduct on

both of these occasions he displayed coolness and moderation indicative of his ability to handle trying situations. His integrity has never been questioned. The only criticism we make of the conduct of petitioner in the performance of his duties is the issuance of a badge to one of his employes for the purpose of displaying his authority in directing the parking of motor vehicles, and in petitioner's own carrying at times a blackjack. We caution petitioner that in exercising the functions of a private detective in the future he is expected to carry on his activities with due regard to the safety and well-being of the public at large. As was said In re Licensed Detectives, 60 D. & C. 544, 546, in the matter of firearms and other means of self-protection, a licensed detective has no greater rights than any other private citizen for he is, in no sense of the word, a police officer. Badges or insignia similar to that of public policemen should never be worn.

The objections to the issuance of the detective's license are dismissed, and we make the following

### Order

And now, to wit, July 9, 1951, it is directed that a detective's license issue to Marlin McAlanis upon the payment of the requisite fee, and upon his filing of a bond, with approved surety, in the sum of $2,000.